Good morning, your honor. Your honor, in this, your honors, in this particular case, Mr. Griffin seeks reversal on a number of grounds briefed, beginning with the affirmative defense issue of public authority, and secondly, with the affirmative defense issue of estoppel by entrapment. Counsel, tell me if I've got this public authority factual background right. As I understood it, this fellow Griffin had been used in a controlled buy situation, and then he was deactivated and told he was deactivated. And this bust was, I think, I think it was months or years later, a considerable period later, and it wasn't a buy, it was a sale. Have I got that right? You have part of those facts right, your honor. He was used in a, he was arrested in 2003 in eastern Washington for delivery of marijuana, and as a result of that arrest, he was then used thereafter to conduct a couple of controlled buys for the DEA. And when were they? Those were in the summer of 2003. After that event in 2003, he was then, he was deactivated in the file. I believe the officer testified that occurred in March of 2004, but the officer at both the Franks hearing and at trial testified that he didn't tell Mr. Griffin that he was deactivated. And specifically, he did not, there was no 302 in the file indicating that he had been deactivated. When was he told? He was not told that he was deactivated. Actually, I think they're DEA sixes, unless they've renumbered the forms. The 302 is an FBI form. Thank you, your honor. But didn't your client receive a, or sign a copy of the informant agreement or contract with DEA when they signed him up? Yes, your honor. And didn't that contain a fixed period of time for his service? It did, your honor. That was to conclude, I believe, in February of 2004, and that's why there was at least some initial inconsistency as to the date of the deactivation. But if the court recalls from the testimony and from what the officer said about their policy, he is supposed to continue his involvement thereafter for collateral events such as testifying in court. And I believe it was in the October 2004 testimony in the Eastern District of Washington with USA Hopkins, where Mr. Hopkins testified, indicated to the trial judge there that there was a contractual agreement between the government and Mr. Griffin. The whole deal here is, is there some evidence to suggest that he thought he was working for the government when he did the sale? In order to get any kind of instruction, he'd need that. And I don't see how anyone could believe that. For one thing, a controlled buy is not a sale. For another thing, with a controlled buy, and this is even aside from the timing, which I think is also a real problem, making it believable, a controlled buy, the person who's working off his bust is used like a robot. He's strip-searched and wired for sound, under surveillance when he goes in, under surveillance when he comes out, strip-searched again. I mean, I don't know, I can't remember in this case, but that's typically how controlled buys are done. And a sale is a whole different deal. It's pretty rare. You don't usually get these people working off their busts with controlled sales, so it happens. I don't see how anyone could believe that. Well, I understand the court's query there, but I think you have to look at all the other facts that come into play there. If the court recalls from the testimony of the officers, and I'm talking about Agents Gillum and Cummings, Mr. Griffin continued to maintain contact with them after 2004 into 2005, multiple phone communications, when he is telling them that he can do deals. He can go out and make them. And they keep turning him down. Yeah, they keep telling him, don't do it. Well, actually, I think they keep telling him, Your Honor, not that it isn't that they don't want him to do it. They tell him, This deal is too low. It's too small for our involvement. We suggest that you contact other people. And, in fact, the agent testified that in one of those conversations he told him, You should not be associating with these people. You should not be negotiating or meeting with them. Wasn't that testimony before the jury? Yes, there was some of that testimony before the jury, but it isn't to that level. It's much more subtle than that because he's saying, the officer indicated, You are at risk here because you're buying a gun store. And because you're buying a gun store, if you're involved in these sales, it could be- You're going to lose your federal firearms license. Right, you're not going to be able to have a federal firearms license. But what's interesting about that, and I think what's interesting about the cases, is that the cases talk about some affirmative act by the officer or some affirmative conduct by the officer implying that you have authority to do this. I think what's also important is the reverse of that. What happens when you don't tell him, Do you realize you're not active? Do you realize that you were deactivated in 2004? You shouldn't do this. But if the testimony was, Don't meet with them. You shouldn't be doing this. I mean, okay, it wasn't in the legally precise language of, This is in violation of your DEA informant agreement, which has now expired, and you're basically off as a lone wolf here. But in reading the record, the testimony seemed pretty consistent to me that the agents were trying to dissuade him from doing all this stuff. And I think that all goes to the reasonable element that comes into play here. Mr. Moore, you see, what you've been reciting and, you know, the question has been asked, you know, all go to, sure, maybe there's evidence on both sides, but, I mean, how does, I mean, one of your arguments is, what, the evidence is not sufficient to over, you know, to defeat a public authority defense? No, I think the affirmative. What are you getting at? Well, the evidence is, you know, maybe somewhat contrary. You know, maybe Mr. Griffin understood, maybe there's a reasonable case he understood that he might have some authority. But obviously, as Judge Tolman says, there's plenty of evidence to show that he was told time and time again, Don't do this and don't do that. Now, isn't that sufficient to sustain the verdict if the instruction was not erroneous, right? Correct. And the district court gave the standard Ninth Circuit pattern jury instruction on public authority. That's correct, Your Honor. And we asked the court to expand that instruction to include the proposition that I articulated. Well, you just wanted the instructions, as far as I can tell, to be recited in the negative. Correct. That's all. It's just the other side of the same coin, right? That's all. What about our decision in Davis that specifically upheld the district court's refusal to give the instruction that you asked for, or the modified instruction, I guess would be the... My response to that, Your Honor, would be that I think each defendant is entitled to instruction based upon the facts presented at that particular case. And I think when you get into... That doesn't help me distinguish a case that I think is squarely on point that upholds the district court's discretion not to give it. I understand. I mean, we're bound by Davis unless you can convince me of some way that I can explain why it doesn't apply. Not at this moment, Your Honor. Okay. Thank you. Thank you. Thank you, counsel. In moving along here, Your Honor, we also had an issue with a particular search warrant in this particular case. And this, again, goes to the facts of what the officers knew or should have known and what they included and did not include in the warrant itself, in the application for the warrant and the defectiveness of the warrant. And that is this warrant authorized the officers to search 1026 South Main, a two-story building, and the business Lolo Sporting Goods. When the officers applied for this warrant, they indicated very specifically that business had been conducted in the basement on the main floor. For whatever reason, they did not articulate any reference to the second story, other than to say in the application that it was a two-story building. Well, but didn't the affidavit contain, or was this testimony at the hearing? I'm confused. Testimony about the surveillance agents that he'd been seen going into the upstairs apartment shortly before a drug deal was consummated. The officer testified at the hearing that he had been seen leaving the back door of Lolo Sporting Goods, went to his white pickup truck, left the pickup truck, walked upstairs. Was in there for about 20 minutes. Was in there for about 20 minutes and then came back down. And then went to do the drug deal. And then apparently was traveling around at the same time of the drug deal. Why isn't that enough to convince a magistrate that it's plausible that incriminating evidence relating to drug trafficking will be found in the upstairs apartment? I think there's two aspects to that. There's the fact that when he left his Lolo Sporting Goods, there was nothing physically on him when the officer observed him. What was the deal for? How many ounces? I believe that was for the second buy, I believe, Your Honor. I think it was for... The question would be, was it a small enough quantity that it could have been concealed in a coat pocket or inside the trousers or something that wouldn't necessarily have been seen by a surveillance agent? I believe it was about four ounces. Not very much. Not very much. Not very much. He was also not seen leaving the second story with anything as well. I mean, he was not seen with anything. And you have to ask yourself the question, what would be found when he's not seen with anything? Presumably if somebody was going to a drug deal, they would not be openly carrying the cocaine. Presumably. Presumably. One would think that a smart drug dealer would hide it until he has to show it. I don't know that that's not an oxymoron to say smart drug dealer. Okay, all right. I mean, we got your client, right? I understand that. Okay. I'd like to reserve the remainder. Thank you, counsel. Counsel. Thank you, Your Honor. May it please the Court. Good morning, Your Honor. My name is Michael Mitchell, and I represented the United States as trial counsel, and I continue to represent the United States here on appeal. Just quickly, a couple of issues which just came up. One, whether or not the Cameron Griffin, the appellant, was informed about whether or not he was deactivated, the answer to that question, according to the record, is yes. And Griffin, or Agent Gillen, specifically told Griffin when Griffin called him, talking about his contact with drug dealers in June of 2004, quote, that he wasn't an active informant and that he shouldn't be meeting with other people. Later, Griffin called in February and March of 2005, had another conversation with Agent Gillen over the telephone, and Gillen once again told him that he was no longer a confidential source and told him, instructed him, I'm quoting from the record, to avoid anyone involved in drug trafficking or drug use. In addition, the record proves that on November 17th of 2003, and this is prior to the actual expiration of the agreement or contract that the DA entered with Mr. Griffin when he was working as a confidential source, on November 17th of 2003, Griffin was specifically told that he was no longer going to be used to make controlled buys and to contact drug dealers. And just looking at the contract which he signed, which by its own terms expires in February of 2004. Now, it's true that his file as a confidential source was closed by the DEA in March of 2004, but that's something different than when his contract would expire. That has to do with the internal workings of the DEA. It's not like a standard procedure to have a closing meeting with him. And I would submit to the court that that closing meeting occurred on November 17th of 2003. That's what the Agent Gillen testified. He said he met with him on that day. He had successfully performed two buys. They explicitly told him that he was not going to be used to make any other drug deals. But at that point his contract, still the technical reading of the contract, stated that it expired by its own terms in February of 2004. The next issue, the search warrant in this case for Lolo Sporting Goods did describe the movements of Cameron Griffin between the lower level of the store and included information about the basement. It included information about the main level, and it included information specific to the upper level of the store. Special Agent, and I'm reading here from what's included in the excerpts of record, tab 18, I'm on page 13, where the search warrant affidavit states that Special Agent Scott Hanton observed Cameron Griffin exit the back door of Lolo Sporting Goods, walked to his pickup truck, registered to him, and then go to the upstairs above Lolo Sporting Goods. And the district court in this case, when ruling on the motion to suppress, and I think this is an important statement, found that the agents in this case link their probable cause determination to the upper level of the building. Otherwise there have been no reason for agents to give a description of Griffin's movements between floors. So I want to ---- Now, Griffin had an ownership interest in the entire building, is that right? Yes, Your Honor. According to the county tax assessor's records, he was the owner of the building, and the building only, according to the tax assessor records, only had one address. Well, that was my next question. Now, there is some evidence in the record about another address for that building. Yes, Your Honor. A couple years old or something like that? That evidence came out in the motion to suppress hearing, and that evidence was a phone book from 2005. If you looked at the phone book and you looked up the name Paul Nolt, according to ---- if you looked in that, it said that there was a 1028 Main Street. And then there was Lori Loman, who is Cameron Griffin's girlfriend, testified at the same hearing that that address, 1028, was the upper level of the building. However, the tax assessor's records didn't have that. The building didn't have a number on the outside indicating that it was separately addressed. And there was no other information known to law enforcement other than that simple entry of Paul Nolt. There is no other information in the record indicating that there was a separate address for the upper level. And I don't know how law enforcement would know to look up Mr. Nolt's name and to somehow infer that there is a separate address, but law enforcement did do what they could, and that was go to the county tax assessor's office and determine that the entire building, in fact, according to the tax assessor, had the single address of 1026 Main Street. Didn't they also include a photograph of the building? They included a photograph on the front, and in addition, and I want to talk about what specifically the search warrant provided for. The search warrant stated that the officers were going to search the business known as Lolo Sporting Goods, located at 1026 Main Street, Lewiston, Idaho. And then it incorporated in, it said, and I'll read it here, it says, more particularly described in Attachment A incorporated herein by reference. And then Attachment A went ahead and defined the place to be searched as including the basement, the main level, and the, quote, upper level that's being used by Cameron Griffin and Lolo Sporting Goods. So there really wasn't any, if the court is looking at the particularity of the search warrant in this case, the officers were describing specifically where they wanted to search and why they wanted to search there. It described the basement, the main level, and the upper level, and then within the affidavit, it gave probable cause for why they wanted to search within those three levels, one being the fact that the drug, the initial drug negotiations took place in. It won't affect this case at all because the facts don't make it critical, but I continually puzzle why I'm asked to look at photographs and I'm not given a decent scan and inkjet picture of the photograph so I can actually exercise judgment on it. Instead, I'm given somebody who just stuck it on a Xerox machine. I had a case a few years ago where a prosecutor was trying to fool us that way. The Xerox prevented us from seeing that what the defense said about how things looked was true and what the government testimony said about how things looked was false. And so every time I see one of these Xeroxes of a photograph, I think about that case. I apologize for that, Your Honor, and if I could have included a better photograph, I should have. And I'm certainly not trying to mislead the court. I mean, my gosh, my cheap home copying machine makes a better copy of the photograph. Anybody could have. Yes, Your Honor. You've sort of hit a chord with all of us. I mean, you heard my problem in the last case with the robbery surveillance photo. For some reason, and this is a practice pointer for both counsel, trial counsel frequently overlook that some of the most important evidence in the case is the exhibits that are admitted into evidence and shown to the jury, and yet either we don't get them included in the excerpts of record or, as Judge Kleinfeld notes, they're so poor we don't know what the jury and the parties were looking at at the trial. Ever since that case where the Xerox was misleading, I think there's somebody trying to fool me when I see a Xerox of a photograph. Yes, Your Honor, and I would submit to the court that – It doesn't matter to this case. That's why I am not – I appreciate you saying that, and I hope it doesn't apply to this case. I don't think there's going to be any disagreement about – Please carry the message back to your colleagues, and counsel, if you could let the rest of the defense bar know as well. It's a real aggravation on appeal. And I apologize to the court. Is there any other specific area that the court wants me to deal with or any specific issue where the court has confusion? I'd be happy to address that issue now. Nope. I don't have any more questions. All right. Thank you, counsel. Thank you, Your Honor. I'd ask the court to affirm the district court's findings as well as the conviction of Mr. Griffin in this case. Thank you. Thank you, counsel. Thank you. Thank you both. Thank you. United States v. Griffin is submitted. We are adjourned for the morning.
judges: Kleinfeld, Tashima, Tallman